FILED
7/19/21 5:38 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | Case No. 20-70172-JAD |
| **RAY M. PRIMEL** and **ESTHER D. GAY-PRIMEL**, | Chapter 13 |
| *Debtors*. | Related to Dkt. No. 91 |

| | |
|---|---|
| Kenneth P. Seitz, Esq.<br>Law Offices of Kenny P. Seitz<br>Ligonier, PA<br>*Attorney for the Debtors* | Owen W. Katz, Esq.<br>Office of the Chapter 13 Trustee<br>Pittsburgh, PA<br>*Attorney for Ronda Winnecour* |
| Josh May, Esq.<br>Richard Cooper, Esq.<br>Coventry First, LLC<br>Fort Washington, PA<br>*Attorneys for Coventry First LLC* | Eric A. Schaffer, Esq.<br>Jeanne Lofgren, Esq.<br>Stonecipher Law Firm<br>Pittsburgh, PA<br>*Attorneys for Coventry First LLC* |
| David Lampl, Esq.<br>Matthew J. Burne, Esq.<br>Leech Tishman Fuscaldo & Lampl, LLC<br>Pittsburgh, PA<br>*Attorneys for Wall Garage 203, LLC and FairMarket Life Settlements Corp.* | David J. Novak, Esq.<br>Law Offices of David J. Novak<br>Johnstown, PA<br>*Attorney for Somerset Trust Company* |

## **MEMORANDUM OPINION**

What should have been a routine asset sale under section 363(b)(1) of the Bankruptcy Code[1] has devolved into an investigation of the conduct of the prevailing bidder, Coventry First, LLC ("Coventry"). During the sale hearing, a representative of Coventry contacted the principal of the other bidder, FairMarket Life Settlements Corp. ("FairMarket"), and advised it of a state fraud investigation allegedly involving the asset. FairMarket and its bidding partner, Wall Garage 203, LLC ("Wall Garage"), now accuse Coventry of trying to chill

---

[1] Unless expressly stated otherwise, all references to "Bankruptcy Code" or to specific sections shall be to the Bankruptcy Reform Act of 1978, as thereafter amended, 11 U.S.C. § 101, *et seq*. All references to "Bankruptcy Rule" shall be to the Federal Rules of Bankruptcy Procedure.

competitive bidding, while Coventry argues "no harm, no foul" given that all parties agree that the ultimate sale price was not impacted. Under the circumstances, the parties have very divergent views on whether Coventry acted in bad faith and, if so, whether *In re Abbotts Dairies of Pennsylvania*[2] mandates disqualification in favor of FairMarket's last highest bid. For the reasons set forth below, the Court will approve the sale to Coventry with a finding under section 363(m) that it did not proceed in good faith.

I.  **BACKGROUND**

Ray M. Primel (the "Debtor") holds a term life insurance policy (the "Policy") with a death benefit of $400,000.[3] The Policy is fully encumbered by a collateral assignment to Somerset Trust Company, the holder of the mortgage on the Debtor's primary residence.[4] On April 7, 2021, the Debtor moved to sell the Policy to Coventry for $175,000, free and clear of all liens under section 363(b).[5]

Shortly before the sale hearing, Coventry withdrew its purchase offer after learning that an auction would occur because another party, Wall Garage, expressed an interest in purchasing the Policy.[6] Wall Garage was the sole bidder at the sale hearing and made the prevailing bid of $175,000.[7] The Court entered an order approving the sale the next day.[8]

---

[2] In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 150 (3d Cir. 1986).

[3] *Motion for Sale of Term Life Insurance Policy Free and Clear of Liens Pursuant to 11 U.S.C. § 363(b)*, Dkt. No. 91 at ¶ 7.

[4] Id. at ¶ 8.

[5] Id. at ¶ 9.

[6] *Amended Order Confirming Sale of Term Life Insurance Policy*, Dkt. No. 98 at ¶ 4.

[7] Id. at ¶¶ 5-6.

[8] Id.

2

Less than a week later, Coventry filed a letter[9] addressed to Debtor's counsel asserting that Wall Garage's acquisition of the Policy violated Pennsylvania's Viatical Settlement Act (the "Act").[10] In support, Coventry explained that only a licensed viatical settlement provider or broker may legally enter into a viatical settlement contract and that Wall Garage is not publicly listed as having such a license with the Commonwealth of Pennsylvania.[11] In an apparent change of heart, Coventry also expressed its willingness to purchase the Policy as a licensed entity in place of Wall Garage, suggesting that it only withdrew its prior offer because the "standard" stalking horse protections were not provided.[12] Considering the alleged impropriety of the sale order, the Court scheduled the matter for a status conference.[13]

Both the Debtor and Wall Garage filed responses denying Coventry's assertion that only a licensed viatical settlement provider or broker could complete the transaction.[14] They contended that Wall Garage, as a "viatical settlement purchaser," was exempt from the licensure requirement.[15] In reply, Coventry disputed Wall Garage's qualification as a "viatical settlement purchaser," positing that the exemption only applies to resale transactions through a licensed

---

[9] *Letter Correspondence*, Dkt. No. 101.

[10] See 40 Pa. Stat. Ann. § 626.1, *et seq.*

[11] *Letter Correspondence*, Dkt. No. 101 (citing 40 Pa. Stat. Ann. §§ 626.2-626.3).

[12] Id.

[13] Under the circumstances, the Court could not ignore the prospect that its sale order might have approved a transaction at odds with applicable non-bankruptcy law. That said, the Court does not condone the use of a letter by a disgruntled bidder as a substitute for either a pre-hearing sale objection or a post-hearing motion for relief, especially where the party had an opportunity to appear at the sale hearing and raise the very issued addressed in its letter.

[14] *Wall Garage 203, LCC's Response to Letter Correspondence of Coventry First, LLC*, Dkt. No. 106; *Response to Document Filed at ECF #101*, Dkt. No. 109.

[15] *Wall Garage 203, LCC's Response to Letter Correspondence of Coventry First, LLC*, Dkt. No. 106 at ¶¶ 18-25 (citing 40 Pa. Stat. Ann. § 626.2).

3

viatical settlement provider.[16] Coventry also reiterated its desire to acquire the Policy and, "as a gesture of good faith," increased its offer to $185,000.[17]

At the status conference, the Debtor argued that Coventry's negotiation of the sale contract, though unconsummated, was enough to render Wall Garage a "viatical settlement purchaser" under the Act. The Court disagreed, but granted Wall Garage a brief opportunity to supplement its defense of the sale.[18] The Court also noted its frustration with Coventry's decision to "take its ball and go home," only to return and object to the sale after the hearing. Because Wall Garage subsequently filed nothing to establish its eligibility as a purchaser, the Court ultimately vacated the sale order and scheduled a new sale hearing for June 30, 2021.[19] The Debtor re-noticed the sale, specifically serving the twenty licensed viatical settlement providers in Pennsylvania.[20]

From the outset, the sale hearing was somewhat chaotic due to a lack of preparedness. Despite having multiple bidders, the Debtor did not obtain good-faith deposits or pre-qualify the bidders.[21] Wall Garage revealed that it had entered into a policy funding agreement with FairMarket, a licensed viatical settlement provider, to enable it to consummate the original sale.[22] After the Court declined to reinstate the vacated sale,[23] Coventry announced that Wall Garage was allegedly under investigation by the Pennsylvania Insurance Department

---

[16] *Letter Correspondence*, Dkt. No. 113.

[17] Id.

[18] *Order*, Dkt. No. 115.

[19] *Order*, Dkt. No. 122.

[20] See Dkt. Nos. 117, 121.

[21] *Trans. of June 30, 2021 Hearing* at 8:19-23. Given that the original sale order had to be vacated because Wall Garage did not qualify as a bidder, it is surprising that the Debtor's counsel was not more proactive in putting this issue to rest.

[22] Id. at 12:3-18. See also *Notice of Policy Funding Agreement*, Dkt. No. 132.

[23] *Trans. of June 30, 2021 Hearing* at 13:22-14:6.

4

for "potential violations" of the Act,[24] and insinuated that Wall Garage's actions had "tainted" the Policy.[25]  The Debtor then raised concerns, echoed by Coventry, about FairMarket's bidding eligibility, observing that publicly-available information showed that its license had expired on June 10, 2021.[26]  Given these issues, the Court took a 50-minute recess so that the bidders could tender deposits and FairMarket could produce evidence that its license was current.[27]

When the hearing reconvened, the parties represented that the wire transfers had been initiated and evidence of FairMarket's renewed license had been provided.[28]  FairMarket and Wall Garage then dropped a bombshell, accusing Coventry of attempting to chill the bidding.  They reported that, during the recess, Coventry's principal contacted FairMarket's principal to inform him that the Policy was under investigation for potential fraud.[29]  Coventry's counsel admitted that the call took place, but suggested its purpose was merely to inform FairMarket of the background of the case, possibly due to a reporting obligation under the Act.[30]  The Court reserved the issue for further inquiry pending the outcome of the auction.[31]

Ultimately, Coventry prevailed with the highest and best bid of $200,000, and the Court registered FairMarket's last bid of $190,000 as the backup bid.[32]  To assess Coventry's good faith under section 363(m), the Court scheduled an evidentiary hearing for July 6, 2021 on the discrete issue of Coventry's recess communication with FairMarket.  Before the hearing,

---

[24]   Id. at 14:15-15:19.

[25]   Id. at 16:7-9.

[26]   Id. at 18:3-19:10.

[27]   Id. at 26:7-20.

[28]   Id. at 28:13-19, 29:8-20, 30:12-31:21; see also Notice of Current License of FairMarket Life Settlements Corp., Dkt. No. 126; Notice Regarding Verification of Deposits, Dkt. No. 127.

[29]   Trans. of June 30, 2021 Hearing at 28:20-29:8.

[30]   Id. at 32:17-33:6.

[31]   Id. at 33:19-34:13.

[32]   Id. at 38:7-10.

5

Wall Garage served subpoenas on Coventry's chief legal officer and assistant general counsel, which Coventry sought to quash for a variety of reasons.[33]

At the start of the evidentiary hearing, the Court stressed its view that the issue before it was a narrow one. To the extent that the subpoenas involved matters beyond the recess phone call, the Court deferred consideration of the motion to quash. The Court clarified that it was Coventry's burden to establish a basis for section 363(m) protection, subject to rebuttal by FairMarket.[34] Only two witnesses testified: Alan Buerger of Coventry and Kenneth Klein, FairMarket's Chief Executive Officer. Based on their testimony, there is really no dispute about the content of Mr. Buerger's call to Mr. Klein.

Mr. Buerger testified that although he is no longer involved with Coventry's daily operations,[35] he just happened to stop into the office of Reid Buerger, his son and Coventry's Chief Executive Officer, during the sale hearing.[36] Reid informed him that FairMarket appeared as an interested party at a hearing to facilitate a purchase for Wall Garage,[37] prompting Mr. Buerger to immediately call Mr. Klein at FairMarket.[38] Although both men knew each other through their work in the viatical settlement industry,[39] they had not spoken in years.[40]

The call lasted only a couple of minutes.[41] Mr. Buerger told Mr. Klein that he had "just learned that . . . FairMarket was bidding on a policy and that [Mr. Buerger] thought he

---

[33] See *Emergency Motion to Quash Subpoenas*, Dkt. No. 129.
[34] *Trans. of July 6, 2021 Hearing* at 8:5-12.
[35] Id. at 22:21-23.
[36] Id. at 27:8-20; see also id. at 43:22-44:1.
[37] Id. at 27:18-25.
[38] Id. at 26:13-17; 28:1-6.
[39] Id. at 25:19-23; 42:5-8.
[40] Id. at 26:5-12; 42:9-12.
[41] Id. at 24:15-16; 51:14-17.

6

should know that [Coventry] had reported the transaction to the State of Pennsylvania as a possible fraudulent viatical settlement act."[42] After highlighting Coventry's statutory obligation to report any alleged fraud to state authorities, Mr. Buerger stated that it was his "understanding that the Pennsylvania State Insurance Department was investigating this transaction."[43] During his testimony, Mr. Buerger could not recall how Mr. Klein responded other than to ask if Coventry intended to bid on the Policy, which Mr. Buerger confirmed.[44] For his part, Mr. Klein testified that he told Mr. Buerger that he was unaware of any fraud investigation, thanked him for the courtesy, and said that he would pass the information on to those at FairMarket directly involved.[45]

On cross-examination, Mr. Buerger testified that his objective in contacting Mr. Klein was to make him aware that FairMarket may be participating in fraud or aiding the fraud of Wall Garage.[46] He admitted that Coventry was under no obligation to notify a competitor of an alleged fraud, but asserted that it is common practice in the industry.[47] Mr. Klein seemingly disputed that point, explaining that he found the call "odd."[48] Even so, Mr. Klein testified that Mr. Buerger did not elaborate on the nature of the alleged fraud,[49] nor that it was reported by Coventry.[50] The Court recognizes that Mr. Buerger did not describe the alleged fraud in his

---

| | |
|---|---|
| 42 | Id. at 20:12-23. |
| 43 | Id. at 24:5-10; see also id. at 23:2-5; 42:15-43:8. |
| 44 | Id. at 22:18-25; 24:2-14. |
| 45 | Id. at 43:3-44:7. |
| 46 | Id. at 30:22-31:6. |
| 47 | Id. at 29:14-20. |
| 48 | Id. at 43:9-14; 44:23-45:23. |
| 49 | Id. at 46:8-10 |
| 50 | Id. at 46:11-13. |

summary of the call either, but clarified on cross-examination that he was referring to Wall Garage's attempt to purchase the Policy without a license.[51]

After the evidentiary record closed, the Court heard oral argument from the parties and took the matter under advisement.

## II. JURISDICTION

This Court has authority to exercise jurisdiction over the subject matter and the parties under 28 U.S.C. §§ 157(a), 1334, and the Order of Reference entered by the United States District Court for the Western District of Pennsylvania on October 16, 1984. This is a core proceeding under 28 U.S.C. § 157(b)(2)(N).

## III. POSITIONS OF THE PARTIES

For all of the bickering, no one disputes that a sale of the Policy should be approved. The points of contention are whether the Court can find Coventry acted in good faith and, if not, whether disqualification is warranted.

### A. Coventry

Coventry asserts that there is no basis to find that it did not proceed in good faith. To start, it emphasizes that, as a licensed viatical settlement provider, it was statutorily required to report its concerns regarding the Wall Garage transaction to the Commonwealth.[52] As a result, Coventry argues the objective of Mr. Buerger's call was merely to share a matter of

---

[51] Id. at 30:3-21.
[52] See 40 Pa. Stat. Ann. § 626.10.

8

concern with Mr. Klein and posits that there cannot be any impropriety for sharing such information with others in the industry even without an obligation to do so.

As for the conduct of the auction, Coventry asserts that there was no fraud or collusion between bidders, or evidence that it took grossly unfair advantage of FairMarket. To the contrary, it contends that all evidence points to a competitive auction between two parties where one made an economic decision to stop bidding. Absent an actual chilling effect, Coventry argues there was no bad faith under *Abbotts Dairies*. It then follows that a $25,000 increase over the original offer, and $10,000 over FairMarket's final bid, reflects fair value to the estate.

But even if the Court were to look dimly on Mr. Buerger's call to Mr. Klein, Coventry asserts that a lack of good faith would only deprive it of section 363(m) protections on appeal and would not impact the validity of the sale. It also argues that the $10,000 increase over FairMarket's bid more than compensates the estate for any damage caused by any alleged bad faith conduct.

B.  FairMarket and Wall Garage

FairMarket and Wall Garage[53] argue that Coventry's conduct demands a finding of bad faith and, as a result, disqualification of its bid. Under *Abbotts Dairies*, they assert that a finding of good faith is a prerequisite to any sale and that the Court must examine the integrity of the purchaser's conduct, not just the result. For this reason, FairMarket and Wall Garage

---

[53]  Coventry argues that Wall Garage lacks standing because it was not an eligible bidder, but for present purposes it is enough to acknowledge that FairMarket and Wall Garage are aligned in their opposition to a sale to Coventry.

9

downplay the significance of the ultimate $200,000 bid, which they acknowledge is fair value for the Policy,[54] or the fact that they stopped bidding for their own economic reasons.[55]

FairMarket and Wall Garage contend that Mr. Buerger's call to Mr. Klein was an objectively clear attempt to chill bidding, and that his testimony offered only a self-serving gloss and a manufactured justification. Of course, they also do not view the call in isolation, but as the latest effort in a "win-at-any-cost approach" employed by Coventry to knock out all competition.[56] FairMarket and Wall Garage cite Coventry's reporting of Wall Garage to the Commonwealth for alleged fraud and its challenge to FairMarket's license at the sale hearing as examples. Though they admit that Coventry's attempt to influence the auction did not succeed, FairMarket and Wall Garage assert that *Abbotts Dairies*' discussion of bad faith encompasses attempted collusion.

For all these reasons, FairMarket and Wall Garage urge the Court to disqualify Coventry and approve the sale to them as the back-up bidder.

## IV.   DISCUSSION

Subject to exceptions not relevant here, section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."[57] In a chapter 13 case, the debtor possesses the rights of a trustee under this section.[58] To obtain court approval of a transaction outside the ordinary course, the debtor must "show that a sound business purpose justifies the debtor's contemplated

---

54    See Trans. July 6, 2021 Hearing at 62:1-3.
55    Id. at 64:23-65:12.
56    Id. at 63:1-7.
57    11 U.S.C. § 363(b)(1).
58    11 U.S.C. § 1303.

actions."[59] The standard is deferential, and a court should accept the debtor's justification unless there is evidence of bad faith.[60] In a sale context, however, lower courts within this circuit have recognized that the transaction must satisfy the following minimum requirements: (1) there is a "[s]ound business reason" for the sale; (2) the debtor has provided "[a]ccurate and reasonable notice" of the transaction; (3) the proposed sale price is "fair and reasonable;" and (4) "[g]ood faith exists."[61]

Curiously, some formulations of the test target the good faith of the purchaser, rather than the debtor.[62] Not only does that shift focus from the evaluation of the debtor's business judgment, it differs from how the standard is applied in other contexts.[63] Admittedly, the United States Court of Appeals for the Third Circuit requires the bankruptcy court to "make a

---

[59] In re Shubh Hotels Pittsburgh, LLC, 439 B.R. 637, 639 (Bankr. W.D. Pa. 2010) (citing In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir.1983)); see Sheehan v. Dobin, No. CIV.A. 10-5054 FLW, 2011 WL 1627051, at *3 (D.N.J. Apr. 28, 2011); In re Antunes, No. BR 15-16553-MDC, 2019 WL 913704, at *8 (Bankr. E.D. Pa. Feb. 19, 2019); In re Elpida Memory, Inc., No. 12-10947 CSS, 2012 WL 6090194, at *1 (Bankr. D. Del. Nov. 20, 2012); In re Titusville Country Club, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991).

[60] In re Shubh Hotels Pittsburgh, LLC, 439 B.R. at 640; see In re Grand Prix Assocs. Inc., No. 09-16545 (DHS), 2009 WL 1850966, at *5 (Bankr. D.N.J. June 26, 2009); In re Aerovox, Inc., 269 B.R. 74, 80 (Bankr. D. Mass. 2001); In re Logical Software, 66 B.R. 683, 686 (Bankr. D. Mass. 1986).

[61] In re Titusville Country Club, 128 B.R. at 399; see In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); In re Shubh Hotels Pittsburgh, LLC, 439 B.R. at 641 n. 4; In re Grand Prix Assocs. Inc., 2009 WL 1850966, at *4; In re Stroud Ford, Inc., 163 B.R. 730, 732 (Bankr. M.D. Pa. 1993); In re Indus. Valley Refrigeration & Air Conditioning Supplies, Inc., 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987).

[62] See In re Delaware & Hudson Ry. Co., 124 B.R. at 176 ("Once a court is satisfied that there is a sound business reason or an emergency justifying the pre-confirmation sale, the court must also determine that the trustee has provided the interested parties with adequate and reasonable notice, that the sale price is fair and reasonable and that the purchaser is proceeding in good faith"); In re Shubh Hotels Pittsburgh, LLC, 439 B.R. at 641 n. 4 ("In the sale context, some courts examine (1) whether there is a sound business purpose for the sale; (2) whether the proposed sale price is fair; (3) whether the debtor has provided adequate and reasonable notice of the transaction; and (4) whether the buyer has acted in good faith."); In re Grand Prix Assocs. Inc., 2009 WL 1850966, at *4 ("Debtors must prove the following: (1) a sound business purpose for the sale; (2) the proposed sale price is fair; (3) the debtor has provided adequate and reasonable notice; and (4) the buyer has acted in good faith"); In re Stroud Ford, Inc., 163 B.R. at 734 (purchaser's lack of good faith obviated the need "to determine whether the consideration offered was fair and valuable or whether sound business reasons exist").

[63] See, e.g., In re Shubh Hotels Pittsburgh, LLC, 439 B.R. at 641 ("In reviewing the Debtor's exercise of its business judgment, the Court looks at whether the proposed transaction (1) represents a business decision, (2) is made with disinterestedness, (3) is made with due care, (4) is *made in good faith*, and (5) does not constitute an abuse of discretion or waste of corporate assets.") (emphasis added).

11

finding with respect to the 'good faith' of the purchaser" when approving a sale outside the ordinary course of business.[64] But that finding is only relevant to the applicability of section 363(m), which is a statutory mootness provision that protects a good-faith purchaser under an unstayed sale order from reversal or modification on appeal.[65] Consequently, the notion that a court *must* find the purchaser acted in good faith to approve a sale likely stems from a misperception of *Abbotts Dairies*.

*Abbotts Dairies* is the seminal case in this circuit regarding good-faith purchasers, but it primarily underscores the need to determine the applicability of section 363(m) before an appeal. In essence, the case involved an approved sale of the debtors' assets without a finding on the purchaser's good faith, despite allegations of collusion. After the appellants failed to obtain a stay pending appeal, the district court dismissed the appeals as moot under section 363(m).[66] The Third Circuit reversed, finding that the district court should have remanded the matter to the bankruptcy court to determine the purchaser's good faith in the first instance.[67] To avoid this scenario in the future, the Third Circuit held that "when a bankruptcy court authorizes a sale of assets pursuant to section 363(b)(1), it is required to make a finding with respect to the 'good faith' of the purchaser."[68]

In sum, *Abbott Dairies* requires the bankruptcy court to make *a finding* as to good faith *when* it approves a sale, *not* find good faith as a condition to it. This point is emphasized in

---

[64]   In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d at 149–50.

[65]   11 U.S.C. § 363(m) ("The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.").

[66]   Id. at 147-48.

[67]   Id. at 149.

[68]   Id. at 149–50.

the Third Circuit defining good faith under section 363(m) as encompassing "one who purchases in 'good faith' for 'value'" in accordance with traditional equitable concepts.[69]  The approach inherently distinguishes between the conduct of the purchaser (good faith) and the integrity of the process (value).  Regarding the first, the Third Circuit explained that:

> The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.[70]

As to the second, the Third Circuit reasoned that an auction compromised by misconduct cannot establish "value" because "no 'auction' took place."[71]  If, however, the misconduct did not deprive the estate of fair value for the assets, a court should still approve the sale under section 363(b)(1) without a good-faith finding under section 363(m).[72]  Though perhaps counterintuitive,

---

[69]  Id. at 147.

[70]  Id. (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)) (internal quotation marks omitted).

[71]  Id. at 149.  In *In re Edwards*, the bankruptcy court read *Abbotts Dairies* to mean that "[t]he absence of a finding of good faith . . . precludes the court from finding that an auction took place and treating the bidding as the "final arbiter of the value of the [debtor's] assets."  In re Edwards, 228 B.R. 552, 566 (Bankr. E.D. Pa. 1998) (quoting id.).  The Court respectfully disagrees that *Abbotts Dairies* goes that far.  In the relevant passage, the Third Circuit stated

> *If Abbotts and ADC colluded* . . . in an attempt to chill the bidding for the assets involved, it would follow that no 'auction' took place in the bankruptcy court; thus, the 'bidding' could not, by definition, serve as the final arbiter of the 'value' of Abbotts' assets."

In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d at 149 (emphasis added).  As this Court reads it, the finished act—i.e., collusion between the debtor and purchaser to chill bidding—would have compromised the auction.  Therefore, it does not necessarily follow that a purchaser's indisputably unsuccessful solo attempt to take advantage would deprive the auction of meaning.

[72]  In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d at 151 (instructing that on remand that "[i]f [the bankruptcy court] finds such collusion, it should then determine whether ADC paid 'value' for the assets purchased. If the court determines that ADC did not pay 'value,' it will then have to determine whether it has the power to undo the sale . . . ."); see In re Edwards, 228 B.R. at 566 ("a finding that an agreement was intended to control the sale price is not sufficient by itself to require disapproval of the sale. Absent a showing that the agreement actually did deprive the estate of fair value for the assets, the sale should be confirmed.").

13

a contrary rule mandating disqualification of all bad-faith purchasers would unfairly punish the estate by robbing it of the full value of an asset derived from an unsullied process.

With the applicable standards under section 363(b) and (m) clarified, the Court turns to the present transaction. The Debtor easily overcomes the low hurdle of demonstrating a "sound business purpose" to sell the Policy. He represented that he intends to use the funds to pay down the mortgage on his primary residence—hardly a capricious or "manifestly unreasonable" reason.[73] The record also reflects that the Debtor has provided adequate notice of the sale in accordance with the applicable rules.[74] Indeed, together with public notice on the Court's *Electronic Access to Sales Information* system and in three local newspapers, the Debtor also served notice of the sale hearing on all creditors as well as all viatical settlement providers licensed in Pennsylvania. This notice led to competitive bidding at a Court-supervised auction that ultimately yielded a highest and best offer of $200,000—an amount that even the disappointed parties concede is fair value for the Policy. Because FairMarket and Wall Garage insist that they stopped bidding for their own economic reasons, the auction was untainted by any attempted chilling and "serve[s] as the final arbiter of the 'value' of [the Policy]" under *Abbotts Dairies*.[75] In sum, the Court finds that the sale is an arm's-length transaction that the Debtor has pursued in good faith. Accordingly, the Court will approve the sale of the Policy to Coventry under section 363(b)(1).

The Court cannot, however, find that Coventry acted in good faith during these proceedings based on Mr. Buerger's phone call to Mr. Klein.[76] The Court acknowledges that

---

[73] See In re Aerovox, Inc., 269 B.R. at 80; In re Logical Software, Inc., 66 B.R. at 686.

[74] See Fed. R. Bankr. P. 6004; W.PA.LBR 6004-1.

[75] In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d at 149.

[76] FairMarket and Wall Garage argue that Coventry also questioned the validity of FairMarket's license in bad faith. The Court disagrees because: (1) the license renewal issue was raised by Debtor's counsel, not

14

licensed viatical settlement providers with "knowledge or a reasonable belief that a fraudulent viatical settlement act is being, will be or has been committed" have a statutory obligation to report that information to the Commonwealth.[77] Because the Court vacated the prior sale order due to Wall Garage's ineligibility to purchase the Policy under the Act, it cannot fault Coventry for reporting the transaction. Still, it does not necessarily follow that contacting FairMarket about it mid-hearing was an innocent act.

That Mr. Buerger felt compelled to contact Wall Garage's bidding partner at all, let alone during the hearing, is innately suspect.[78] The Court approaches this analysis mindful that Coventry initially withdrew its offer for the Policy when it discovered that the sale was subject to higher bids. This gives the impression that Coventry bristled at the prospect of competitive bidding and only renewed its interest after concluding that Wall Garage was unqualified to bid. It is also telling that the Policy's alleged taint did not deter Coventry from aggressively pursuing its acquisition.

Frankly, it is inconceivable that Mr. Buerger's call to Mr. Klein had any purpose other than to undermine Wall Garage's efforts to acquire the Policy. Remember that the substance of the call is undisputed. Mr. Buerger informed Mr. Klein that Coventry reported "the transaction" as a fraudulent viatical settlement act and suggested that "this transaction" was under investigation.[79] The Court finds Mr. Buerger's conduct objectively unreasonable for several reasons. First, he did not explain the nature of the report or the alleged fraud to Mr.

---

Coventry; (2) the publicly-available information suggested that FairMarket's license had expired prior to the hearing; and (3) it is hardly unreasonable to expect a bidder to prove their qualifications prior to the auction.

[77] 40 Pa. Stat. Ann. § 626.10(c).

[78] It is worth noting that there is typically no reason for bidders to talk to each other during the sale hearing, and that doing so will always raise the specter of collusion or other misconduct.

[79] See Trans. July 6, 2021 Hearing at 20:12-23; 23:2-5; 24:5-10; 42:15-43:8.

Klein, depriving Mr. Klein of any ability to meaningfully evaluate the information before the imminent auction.[80] Second, the alleged fraudulent act referenced by Mr. Buerger was Wall Garage's prior attempt to acquire the Policy without a license, which was irrelevant to the new funding arrangement between FairMarket and Wall Garage. Third, Mr. Buerger's concern that FairMarket may have been unknowingly participating in a fraudulent viatical settlement act by aiding Wall Garage is disingenuous because that is not related to the reported fraud, but centers on the prudence of the contractual relationship between them. Finally, even assuming a heads-up was appropriate, Coventry's counsel already disclosed the reputed existence of the fraud investigation at the sale hearing prior to the recess.[81]

Subjectively, the Court finds Mr. Buerger's alleged altruistic motivations incredible because he cannot disclaim the effect of his statements. Taken at his word, he was concerned enough about the viatical settlement industry to alert FairMarket that it might be participating in fraud, but did not actually seek to modify FairMarket's behavior. In the same vein, Mr. Buerger wanted FairMarket to be aware of an alleged fraud investigation, and perhaps that Coventry had reported it, but apparently not anything else about it. This vague warning just before bidding seems akin to telling a restaurant patron at the door, "there's a fire in there"—a true statement pertaining to both a table candle and a room engulfed in flames. Mr. Buerger would have the Court believe that such a caution is not meant to dissuade the patron from entering, but that defies logic and practical experience. For all these reasons, the Court finds that the purpose of Mr. Buerger's call to Mr. Klein was to spook FairMarket into reconsidering its relationship with Wall Garage, which had only been memorialized that morning, after counsel's

---

[80] Id. at 46:8-10
[81] See Trans. June 30, 2021 Hearing at 16:7-9.

open court statement failed achieve the desired effect.[82] In this light, the Court also construes Mr. Buerger's emphasis on Coventry's statutory duty to report suspected fraud, which was already known to Mr. Klein, as a veiled threat if FairMarket moved forward with Wall Garage. In other words, Mr. Buerger sought, though unsuccessfully, to supress bidding. Under *Abbotts Dairies*, this was "an attempt to take grossly unfair advantage of other bidders" and reflects bad faith.[83] As such, Coventry is not entitled to the protections of section 363(m).

But that is not the end of it. Coventry must account for its brazen attempt to manipulate the sale of the Policy. The Court cannot and will not tolerate such an assault on the integrity of the sale process simply because the effort failed. Even if the auction generated fair value, the Debtor and the estate were still harmed by the delay attendant to an evidentiary hearing and the preparation of written findings necessitated by Coventry's bad faith. Its suggestion that the $10,000 premium over FairMarket's bid adequately compensates the estate for any damage is appallingly wrong. Putting aside the fact that the added expense has yet to be calculated, bidder misconduct is not an appropriate cost of sale. And if accepted, the unintended consequence of Coventry's argument is that the Court should not have weighed the bids "apples to apples" if one baked-in a bad-faith expense. For that reason, the Court will order Coventry to show cause why the Court should not impose sanctions under section 105(a) and its inherent powers considering the bad-faith conduct which occurred during the sale hearing.

In closing, the Court observes that there is no further need of discovery since the record was sufficient to establish that Coventry did not purchase in good faith. As a result, the Court will quash the subpoenas issued by Wall Garage.

---

[82] See *Notice of Policy Funding Agreement*, Dkt. No. 132.

[83] In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d at 147 (quoting In re Rock Indus. Mach. Corp., 572 F.2d at 1198) (internal quotation marks omitted).

## V. CONCLUSION

In light of the foregoing, the Court will enter an order approving the sale of the Policy to Coventry, but will not find that Coventry is a good-faith purchaser and will order it to show cause based on its bad-faith conduct. Additionally, the Court will grant Coventry's motion to quash Wall Garage's subpoenas. This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052. The Court will issue separate orders consistent with this opinion.

ENTERED at Pittsburgh, Pennsylvania.

Dated: July 19, 2021

GREGORY L. TADDONIO
UNITED STATES BANKRUPTCY JUDGE

Case administrator to mail to:
Kenneth P. Seitz, Esq.
Owen W. Katz, Esq.
Josh May, Esq.
Richard Cooper, Esq.
Eric A. Schaffer, Esq.
Jeane Lofgren, Esq.
David Lampl, Esq.
Matthew J. Burne, Esq.
David J. Novak, Esq.